## METROPOLITAN LEAD & ZINC MINING COM-PANY v. WEBSTER, Appellant.

### Division One, February 22, 1906.

1. **NEW TRIAL: No Ground Specified: Appeal.** Although the court did not specify the ground upon which a new trial was granted, it will, nevertheless, on appeal, be sustained if, on any of the grounds set forth in the motion, it ought to have been sustained.

2. ————: **Weight of Evidence: Undisputed Facts.** The appellate court will not interfere with the discretion of the trial court in granting one new trial, supposably upon the assigned ground that the verdict was against the weight of the evidence, unless, upon the undisputed facts in the case, no verdict for the party asking for a new trial could ever be allowed to stand.

3. **CORPORATION: Subscription: Fraud: Parol Evidence.** The subscriber to articles of association of a corporation, when sued thereon by the company for the unpaid amount of his subscription, may show, by parol evidence, that the articles were a fraud and his signature thereto obtained by fraud.

4. **WRITTEN CONTRACT: Fraud: Parol Evidence.** The rule that a written contract cannot be contradicted or modified by parol evidence has never been held to preclude parol evidence tending to prove that the instrument itself was a fraud or that the signature of a party thereto was obtained by fraud.

5. **CORPORATION: Fraud: Unpaid Subscription: New Trial.** Where it appears from the undisputed evidence, in a case brought by a corporation against a subscriber to its articles of association to compel him to pay for the stock therein stated to have been subscribed by him, that the company was a mere paper corporation; that those who subscribed to its articles never paid any money or turned over any property to the company; that it has not and never had any capital, either in property or money; that it never carried on the business for which it was incorporated or attempted to do so, and hence has no creditors whose rights need be considered; that defendant's name to its articles was obtained by false representations that it owned certain valuable mining leases, and that he was to be paid certain money for his interest in valuable properties, which was not paid; and that he never participated in its organization or operations, no verdict for plaintiff could ever be permitted to stand, and the court erred in granting it a new trial after verdict for defendant.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,*
Judge.

Reversed and remanded (*with directions*).

*C. H. Montgomery* for appellant.

(1) The answer of defendant alleged, and the undisputed proof conclusively established, that defendant was induced to sign the subscription for stock by fraudulent misrepresentations as to the leases and property which belonged to the company, this suit being by the pretended corporation and the rights of no creditors being involved. Where a subscription to corporate stock has been procured by fraudulent misrepresentations, the contract is void, and the subscriber may even recover back what he paid, the creditors taking no part in the proceedings. Ramsey v. Manfg. Co., 116 Mo. 313; Fire Kindler Co. v. Rischert. 74 Mo. App. 541; Wills v. Jones, 41 Mo. App. 1; Ins. Co. v. Owens, 81 Mo. App. 201. (2) An incomplete written contract may be aided by parol evidence and the actual consideration may always be shown, especially where the consideration is not stated in the contract. Hequembourg v. Edwards, 155 Mo. 514; State v. Cunningham, 154 Mo. 172; Sanders Co. v. Columbia Co., 86 Mo. App. 169; Ittner v. Hughes, 154 Mo. 65; Newburry v. Durand, 87 Mo. App. 290; Roe v. Bank, 167 Mo. 406; Christian v. Smith, 85 Mo. App. 117; Bowring v. Railroad, 90 Mo. App. 324; Van Ravensway v. Co., 89 Mo. App. 73; Liebke v. Knapp, 79 Mo. 22. A different kind of consideration may be shown from that mentioned in the deed. Jackson v. Railroad, 54 Mo. App. 636; Edwards v. Latimer, 183 Mo. 610; Trust Co. v. McMillan, 188 Mo. 547; Hequembourg v. Edwards, 155 Mo. 514. This so-called corporation never in fact had a legal existence. It was a sham and a legal fraud from the very beginning. (3) A corporation illegally organized cannot collect capital

stock. 1 Purdy's Beach on Priv. Corp., secs. 124, 125; Ins. Co. v. Gazhorn, 2 Mo. App. 206; Bank v. Keith, 85 Mo. App. 409; Fenton v. Ham, 35 Mo. 409; Hamilton v. Schull, 25 Mo; Banking Co. v. Manfg. Co., 168 Mo. 646.

. *C. H. Nearing* and *C. V. Buckley* for respondent.

(1) The court erred in permitting defendant to offer any evidence tending to vary the written contract of subscription. Cook on Stockholders, sec. 138; Ollesheimer v. Mfg. Co., 44 Mo. App. 181; Hotel Co. v. Wright, 73 Mo. App. 243. (2) Defendant was not in any manner defrauded, but on the contrary was attempting to defraud the company by attempting to procure the payment to him of $8,000 with a secret understanding that a large portion of this was to be divided among some of the officers. (3) Appellant makes no showing but that the court was correct in granting a new trial on account of error in the instructions or in the admission or rejection of evidence.

BRACE, P. J.—This is an appeal by the defendant from an order of the Jasper Circuit Court granting a new trial in an action for the recovery of an alleged unpaid subscription to the capital stock of the plaintiff company, in which the verdict was for the defendant. The petition and answer in the case are as follows:

PETITION. '

"Plaintiff for cause of action states that it is a corporation organized and existing under and by virtue of the laws of the State of Missouri. That the above-named defendant was one of the original incorporators, and a member of the first board of directors of this plaintiff. That on or about the 3rd day of January, 1901, defendant subscribed for one hundred shares of the capital stock of this plaintiff, of the par value of

193 Sup—23

$100 each, and thereupon became obligated to pay plaintiff the sum of ten thousand dollars. That payment thereof has been demanded and no part of the same has been paid.

"Wherefore, plaintiff asks judgment against defendant for the sum of ten thousand dollars and interest thereon from January 3, 1901, together with its cost herein expended."

ANSWER.

"Defendant for answer to plaintiff's petition denies that on the 3rd day of January, 1901, or at any other time, defendant subscribed for one hundred shares of the capital stock of the plaintiff, at the par value of one hundred dollars each, and thereupon became obligated to pay plaintiff the sum of ten thousand dollars, or any other sum. Defendant denies each and every other allegation of said petition, and having fully answered, asks judgment for costs of suit.

"2. Defendant for a further defense and answer to plaintiff's petition states: That at and before the signing of the articles of association of plaintiff, as hereinafter set out, and at and prior to the 3rd day of January, 1901, defendant was the owner of an undivided seven-twelfths interest in a mining lease known as the 49 Lease, the same being a lease upon the following described forty acres of land, described as follows, to-wit: The northwest quarter of the southeast quarter of section seven, township 27 of range 33, in Jasper county, in the State of Missouri, and was also the owner of a sixty-ton crushing and cleaning mill, situate upon said lease; which said interest in said mill was of the value of six thousand dollars, and the said interest of the said defendant in the said lease and mill was of the value of eighteen thousand dollars.

"That at and before the signing by him of the articles of association of plaintiff as herein set out, M.

W. Clay, a promoter of said plaintiff company, who was then engaged in inducing parties to subscribe for the stock of plaintiff corporation, falsely and fraudulently represented to defendant that said plaintiff company was the owner of mining leases on fifteen hundred acres of mining land, in Newton county, Missouri, near the towns of Dayton and Spurgeon, Missouri, and that ore had been developed on said land, and that said leases were for a period of ten years and at a royalty of eight per cent on all ores to be mined from said land; and that said leases had been delivered and were in the hands of persons to be conveyed to plaintiff corporation. And defendant avers that said representations were false and fraudulent, that said leases were never transferred to any one to hold for said plaintiff corporation, neither have they or any of them ever been transferred to said corporation.

"That by reason of the false and fraudulent representations aforesaid, defendant was induced to agree to trade his undivided seven-twelfths interest in said mining lease and mill for ten thousand dollars fully paid up and non-assessable stock of the plaintiff corporation, and fifteen hundred dollars in money, to be paid by plaintiff corporation to defendant, and in futherance of said arrangement and by reason of the false and fraudulent representations above set out, the defendant was induced to sign the articles of association of plaintiff corporation and in no other manner, and for no other purpose. That the said plaintiff at all times refused to comply with said agreement to issue any stock to defendant or pay defendant any money. And that no stock of plaintiff company was ever issued to defendant. And defendant alleges that no property or money was ever paid or delivered by any one to said corporation, in payment for the capital stock of said plaintiff corporation, or for any part thereof, and de-

fendant having fully answered asks judgment for costs.''

The answer contained two other pleas: one of which was withdrawn, and upon the other no evidence was offered and they are, therefore, omitted.

The reply was a general denial.

The plaintiff to sustain the cause of action introduced in evidence the following articles of association:

''State of Missouri, County of Jackson: ss:

''Know all men by these presents:

''That we whose names are hereunto subscribed, do hereby associate ourselves together for the purpose of forming a corporation under the provision of article nine, chapter twelve, of the Revised Statutes of 1899, and for that purpose do hereby adopt the following articles of association and incorporation, to-wit:

''First. The name of the corporation shall be the Metropolitan Lead & Zinc Mining Company.

''Second. The principal office of this corporation shall be located at Kansas City, in the county of Jackson, State of Missouri.

''Third. The capital stock of said corporation shall be one hundred thousand dollars, divided into one thousand shares of the par value of one hundred each. The same has been bona-fide subscribed and one-half thereof actually paid up in lawful money of the United States, and is in custody of the persons hereafter named as the first board of directors.

''Fourth. The names and places of residence of the several share-holders and the number of shares subscribed by each are as follows: Elmer Webster, Joplin, Missouri, 100 shares; A. M. Earhart, Kansas City, Missouri, 300 shares; M. W. Clay, McElhaney, Missouri, 300 shares; V. D. Snyder, Kansas City, Missouri, 50 shares; Wm. A. Shuman, Kansas City, Missouri, 250 shares.

''Fifth. The business of this corporation shall be

managed by a board of directors, consisting of five; and the following named persons to-wit, W. M. Clay, Elmer Webster, V. D. Snyder, A. M. Earhart, Wm. A. Shuman, shall constitute the said board of directors for the first year.

"Sixth.   This corporation shall continue a body corporate for the period of fifty years.

"Seventh. The purposes for which this corporation is formed are as follows:

"To carry on and conduct a general mining business, such as procuring lands by purchase or otherwise, and mineral leases thereon; to prospect and operate the same for mineral substances and deposits; to sell, convey, or otherwise dispose of the same by deed, mortgage, lease, bond or otherwise; own and operate all machinery and improvements necessary to successfully prosecute and carry on said business and carry on a general real estate business.

"Witness our hands and seals this 7th day of January, 1901.

> "Elmer Webster,
> "A. M. Earhart,
> "M. W. Clay,
> "V. D. Snyder,
> "Wm. A. Shuman."

The articles were duly acknowledged by the defendant on the third of January, 1901, and by the other parties on the seventh of January, 1901, and on the same day were duly recorded.

The plaintiff then introduced the certificate of the Secretary of State of its incorporation therein, dated January 8, 1901, duly recorded on the 9th of January, 1901, and rested its case.

Thereupon, the defendant demurred to plaintiff's evidence, his demurrer was overruled, and the defendant, over the objections of the plaintiff, introduced parol evidence to sustain his defense. The facts disclosed

by this evidence are substantially stated in the brief of counsel for appellant as follows:

"Defendant is and was a hardware merchant in Joplin, Missouri. In the year 1900 he owned an undivided seven-twelfths interest in a first lease on 49 acres of mining land for an unexpired term of four and one-half years and at a royalty of twelve and one-half per cent, known as the 49 Lease, and was also the owner of a seven-twelfths interest in a sixty-ton crushing and cleaning mill on said lease and that his interest in the lease and mill was worth $18,000 to $20,000. He had spent about $8,500 to $8,600 in developing it, and not having the money to go ahead with the development, wanted to sell his property, or get some one interested with him.

"In the fall of 1900, M. W. Clay was in the real estate business in Kansas City, Missouri. He went to Joplin frequently, and on such occasions went to defendant's store, and talked to him about selling his lease and mill.

"In December,1900, Clay dropped into defendant's store several times and during these visits told the defendant that he and others had organized a corporation, the Metropolitan Lead & Zinc Mining Company, and that this corporation would buy his property. Clay told defendant that this corporation had leases on fifteen hundred acres of mining land in Newton county, near Spurgeon, a booming mining camp, at a royalty of eight per cent, a very low royalty, two drill holes in ore and one shaft in ore on this land. Clay also stated that these leases were in possession of one Earhart for the company. Clay proposed to defendant that this corporation would buy his seven-twelfths interest in his lease and his seven-twelfths interest in the mill and would pay him fifteen hundred dollars in cash, and ten thousand dollars in full-paid-up and non-assessable stock of this corporation, and that the company would send

down twenty-five thousand dollars in cash to develop the lease. Clay also said that the corporation had sold stock and had this amount on hand to develop this lease. That on account of these statements and representations as to the large amount of mining land leased at such a low royalty, near the then booming mining camp of Spurgeon, and the ore developments on the same, defendant agreed to trade his seven-twelfths interest in said lease and mill for said paid-up stock and money. Clay sent corporation papers down for defendant Webster to sign to carry out this arrangement and defendant signed them to consummate this trade and for no other purpose. Defendant testified that he knew but little about corporations, and signed the papers without reading them, relying on the representations of Clay that the corporation would do as agreed.

"Time went on and no money was sent down by the corporation to develop the property or to pay defendant for his interest in the lease and mill. After repeated demands for the money due him under the contract, the secretary and general manager, Earhart, notified defendant that the representatives of the company would be down to Joplin to see defendant about his lease on the 29th day of January. On January 29th Director Snyder, Vice-President Clay and Secretary and General Manager Earhart went to Joplin, and then and there defendant Webster tendered them his lease and interest in the mill, and demanded his fifteen hundred dollars, as per agreement. These representatives of the company said it was a good property, but they wanted the whole of it. They also wanted it for less royalty and for a longer time. Webster informed them that the owner of the land would give a new lease for a royalty of ten per cent for a period of ten years, but the company owning the land would require a payment of one hundred dollars per month rental, whether ore was produced or not. Defendant Webster informed them

that he could acquire the whole lease and make this change. So these representatives of the plaintiff authorized defendant to make this change; acquire the whole property, surrender the old lease and take a new one on the terms proposed, and they agreed that the company would pay him for such new lease and the mill $6,500 additional to the first arrangement of $1,-500, making $8,000 in cash, and $10,000 in paid up and non-assessable stock of said corporation.

"In compliance with this agreement defendant acquired the other five-twelfths interest in the lease and mill, surrendered his old lease, and took a new lease for ten years at a royalty of ten per cent, with an arbitrary rental of $100 per month to be credited on royalty if ore was produced, but if none was produced, to be paid anyway, and paid the first month's rental himself. He notified the company what he had done, and demanded that the company comply with its agreement, but the company never did, it never paid him any money or delivered him any stock under either agreement.

"In February following the signing of the corporation papers, defendant was asked to participate in a meeting of the company, but refused to do so, and stated that until the company complied with its contract, he did not consider that he was a stockholder. He was also named in the corporation papers as director, and also elected treasurer, but refused to serve in either capacity because he claimed he was not a stockholder.

"After this he learned that the corporation had no money; that the members of the company relied on Snyder selling $25,000 treasury stock at par, but he was unable to dispose of any. He also learned that the leases on fifteen hundred acres of land in Newton county, near Spurgeon, had never been turned over to the corporation, neither had they ever been delivered to any one for the corporation. He learned that Clay and the other members of the corporation had had a dif-

ficulty, and that Clay was to retain these leases and not turn them over to the corporation at all. He also learned that no one had paid in anything on their stock, and that the company had neither money nor property. Under the first arrangement defendant was to receive $1,500 individually in addition to the stock, but afterwards Clay and Earhart insisted that this money be used to develop the lease, and defendant agreed to it. Clay and Earhart also insisted that the balance of the $8,000, that is $6,500, which was coming to defendant under the second agreement, be also divided among members of the company, and defendant agreed that all over the actual cost of the five-twelfths interest should be so divided.

"In answer to defendant's demands that the company pay him the $8,000 under the last agreement, the members of the company objected to the rental clause. Clay, however, testified, and it was not disputed, that the company had no real objection to that clause, and that the objection was only urged because Snyder could sell no stock, and the company could raise no money to pay defendant for his lease and mill, and that the objection was only an excuse which the company put forward for not paying defendant, as agreed. The company not being able to raise any money, Clay proposed to Snyder to pay in $50 apiece and accept the lease with the rental clause in it, but Snyder said he did not want to put any money into it until he sold some treasury stock. Defendant now found himself in this predicament: on the faith of the promises of ample money to develop the lease he had surrendered a lease which did not require any payment except the royalty on the ore actually produced, and had taken a lease which required a payment of $100 a month whether any ore was produced or not. He had also gone on at the request of the members and officers of plaintiff company and incurred considerable expense in acquiring the whole of

the lease and mill. He now found himself unable to either make the payments or dispose of his lease, and he lost his whole investment so far as the lease was concerned."

The plaintiff offered no evidence in rebuttal, but at the close of the evidence each of the parties asked for a peremptory instruction in his favor, which being refused, the issues were submitted to the jury on instructions, which need not be set out, as no point is made upon them.

The jury returned a verdict for the defendant, and in due time plaintiff filed its motion for a new trial as follows:

"Comes now the plaintiff and moves the court to to set aside the verdict of the jury herein and grant it a new trial in this cause for the following reasons, to-wit:

"1. The court erred in admitting incompetent and improper testimony on the part of the defendant, and erred in refusing to admit competent and proper evidence on the part of the plaintiff.

"2. The court erred in refusing proper and legal instructions offered by the plaintiff, and erred in giving improper and illegal instructions on the behalf of the defendant, and on the court's own motion, to-wit, all the instructions given for defendant as aforesaid.

"3. The verdict of the jury is contrary to the weight and preponderance of the evidence, and all evidence; contrary to the law, and instructions given by the court; that said verdict was the result of prejudice by the jury and improper remarks and conduct on the part of the defendant's attorneys in the trial of said case, and is without any evidence to support it.

"4. On the entire evidence and pleadings the verdict should have been for the plaintiff, and the court should have so directed the jury.

"Wherefore plaintiff prays that said verdict be set aside and it have a new trial herein."

The court sustained the motion, without specifying the grounds upon which the new trial was granted, as required by statute (R. S. 1899, sec. 801), and the defendant appealed.

I. Although the order of the court did not specify the grounds upon which new trial was granted, the order will be sustained if, on any grounds set forth in the motion, it ought to have been sustained. [Hewitt v. Steele, 118 Mo. 463; Bank v. Wood, 124 Mo. 72; Kreis v. Railroad, 131 Mo. 533.]

And for the plaintiff it is contended that the order ought to be sustained on the ground that the court committed error in admitting defendant's parol evidence. It is urged that this was error, because such evidence tended to contradict the written contract of subscription, meaning, of course, defendant's contract of subscription manifested by the articles of association. This contention is based upon an entire misconception of the nature of the defense set up in the answer and of the purpose of the evidence introduced in support of it. The defendant in his answer admitted signing the articles of association, did not seek to change or alter the same in any part, and did not introduce any evidence contradicting any of its contractual terms. His defense was that the articles of association was a fraud and that his signature thereto was obtained by fraud, and the evidence which he introduced was for the purpose of proving the fraud. The rule that a written contract cannot be contradicted or modified by parol evidence has never been held to preclude parol evidence tending to prove that the instrument itself was a fraud or that the signature of a party thereto was procured by fraud, and nothing to that effect can be found in the authorities cited in support of this contention, or elsewhere. "Contracts to take stock in a corporation stand upon the same footing as all other conventional obligations. If induced by fraud they create no obligation and the injured party

has a right to have them abrogated." [2 Thompson on Corporations, par. 1362.]

This contention based on the first ground stated in the motion for new trial is, therefore, untenable and is the only ground specifically pointed out by counsel for plaintiff on which it is claimed the motion for a new trial ought to have been sustained, but there is another ground in the motion upon which it may have been sustained, i. e., that the verdict is against the weight of the evidence; and as this was the first trial of the case it was within the discretion of the court to grant a new trial on that ground, a discretion that this court will no interfere with unless, upon the undisputed facts in the case, no verdict for the plaintiff would ever be allowed to stand. [Ottomeyer v. Pritchett, 178 Mo. 160; Warner v. Railroad, 178 Mo. 125; Herndon v. Lewis, 175 Mo. 116.]

Is this such a case? We think it is. It appears from the undisputed evidence in the case that the plaintiff is a mere paper corporation; that those who subscribed to the articles of association never, in fact, paid any money or turned over any property of value to the corporation; that it has not now and never had any capital whatever either in money or property, and that it never carried on the business for which it was incorporated or attempted to do so, and hence has no creditors whose rights need be considered. Can such a sham corporation, in itself a fraud and an abortion, have any standing in court to enforce an obligation to pay for its fictitious stock based upon no capital whatever? No authorities can be be cited answering this question, for, so far as we have been able to discover, this is the first instance in which such an attempt was ever made, and long may it be the last, for the courts of this country will never lend their assistance to the maintenance of such a fraud, and that is a sufficient answer to the question. Hence, a verdict against the defendant, who was induced to sign the articles of association of this sham

corporation by fraudulent representations, and thereafter never participated in its organization or operations, if any it had, could never be sustained. Therefore, the order of the circuit court setting aside the verdict was error, for which the same will be reversed, and the cause remanded with directions to the circuit court to enter judgment for the defendant on the verdict.

All concur.